TERESA L. STRICKER, City Attorney (SBN 160601)
ADAM S. ABEL, Assistant City Attorney (SBN 148210)
NATHAN L. PUTNEY, Assistant City Attorney (SBN 325339)
City of Santa Rosa
100 Santa Rosa Avenue, Rm. 8
Santa Rosa, California 95404
Telephone:  (707) 543-3040
Fax:  (707) 543-3055

Attorneys for Defendants CITY OF SANTA ROSA;
Officer CODY SOUSA, and Officer Christopher O'NEILL

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN PAUL JOHNSON, | CASE NO.:  3:23-cv-02478-JSC |
| Plaintiff, | **DEFENDANTS' TRIAL BRIEF** |
| v. | |
| CITY OF SANTA ROSA, OFFICERS CODY SOUSA, O'NEILL, DELEON, JONES AND DOES 1-50, | Pretrial Conf.: November 20, 2025<br>Time: 2:00 p.m.<br>Courtroom: Crtrm. 8, 19th Floor<br>Judge: Hon. Jacqueline Corley |
| Defendants. | Trial Date:  January 5, 2026 |

Defendants, CITY OF SANTA ROSA, OFFICER CODY SOUSA, and OFFICER CHRISTOPHER O'NEILL (collectively, "Defendants") hereby submit the following as and for their Trial Brief regarding the issues in the above-entitled action.

## I.    STATEMENT OF FACTS

The incident underlying this case occurred on March 23, 2022.  On that date and time, probable cause existed for Plaintiff JOHN PAUL JOHNSON's (hereinafter "Plaintiff") arrest, pursuant to Penal Code § 396, for multiple violations of a domestic violence restraining order, all within the preceding days.  In addition, Plaintiff had recently been making a flood of aggressive and threatening phone calls to 911 dispatch, and SRPD officers had previously attempted to, but were unsuccessful in locating him to conduct a welfare check. Taken together, it appeared that Plaintiff was spiraling, and his concerning behavior escalating.  For these reasons, the Defendant Officers

-1-

were instructed to be on the lookout for Plaintiff during their shifts, and to arrest and bring him into custody if located.

Moreover, long before the date of incident, Plaintiff was already well known to SRPD, and to the Defendant Officers, as posing a potential threat to law enforcement and the public at large, having been the subject of several Threat Assessments and Officer Safety Bulletins in the preceding years. As of the date of the incident, Plaintiff was considered an officer safety threat and deemed to be a subject requiring a multiple officer response to any call involving him.

In the afternoon hours on the date of March 23, 2022, Plaintiff was located by Officer Sousa at a local market. Plaintiff disobeyed Officer Sousa's initial verbal commands to sit down and not enter the store; was behaving erratically and making incoherent statements; and appeared to Officer Sousa to be under the influence of a controlled substance. Officer Sousa, who was alone with Plaintiff, attempted to place him under lawful arrest peacefully and without incident. Notably, Plaintiff outweighed Officer Sousa by approximately 75lbs. However, rather than submitting to arrest, Plaintiff instead feigned cooperation and "surrender", then fled from Officer Sousa on foot, before Plaintiff could be searched for weapons or contraband or placed under arrest.

A short foot chase ensued, after which Plaintiff inexplicably ceased his flight and laid down on the ground, once again as if to "surrender". Within seconds of doing so, Officer Sousa and Officer O'Neill – the latter of whom witnessed the chase while on route to the scene, and who arrived at the location at the precise moment that Plaintiff stopped and was getting down on the ground – took hold of Plaintiff's arms, and both Officer Sousa and O'Neill noted that Plaintiff was tensing and flexing his arms in the moment that they attempted to place him into handcuffs. Accordingly, and consistent with department policy and accepted standards of policing, each used a "twist lock" control hold to control Plaintiff while handcuffing him for arrest, with Officer Sousa initially taking hold of Plaintiff's left arm, and Officer O'Neill taking hold of Plaintiff's right arm.

During the encounter, a "pop" emanated from Plaintiff's right arm, and after being fully secured in handcuffs, he then complained of pain in his elbow. Plaintiff was made comfortable; was evaluated by EMS at the scene; and was transported to the hospital, where he was diagnosed with a right radial head fracture. He was prescribed a sling and rest for treatment and transported to the

-2-

county jail for booking.

## II.   NATURE OF PLAINTIFF'S CLAIMS

### A.  Officer Christopher O'Neill

Plaintiff claims that Officer O'Neill's use of a "twist lock" on his right arm during his lawful arrest when he was in a prone position with his hands behind his back was an objectively unreasonable use of force. Plaintiff contends that since he had fully surrendered, not even a "twist lock", a pain compliance technique considered to be a minimal level of force that is reasonable to prevent continued resistance by or flight of a subject, was unreasonable under the totality of the circumstances, in violation of his constitutional and statutory rights.

Plaintiff further alleges that Officer O'Neill similarly used excessive force in maintaining him in handcuffs behind his back following his complaint of injury. In his First Amended Complaint, Plaintiff has pled the following causes of action: (1) § 1983 claim for use of excessive force; (2) California battery claim; (3) Bane Act claim; and (4) negligence.

### B.  Officer Cody Sousa

Plaintiff has a lone § 1983 use of force claim in violation of his Fourth Amendment constitutional right for maintaining him in handcuffs behind his back following his complaint of injury.

## III.   THERE WAS NO FOURTH AMENDMENT VIOLATION OF PLAINTIFF'S CONSTITUTIONAL RIGHTS

In the seminal case of *Graham v. Conner*, 490 U.S. 386, 396 (1989), the United States Supreme Court set forth the standard for reviewing police officer conduct in determining whether a police officer has violated the constitutional rights of a suspect:

> "Reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight...Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split second judgments–in circumstances that are tense, uncertain and rapidly evolving–about the amount of force that is necessary in a particular situation."

-3-

Thus, the correct inquiry is not "whether another reasonable or more reasonable interpretation of the events can be construed…after the fact". *Hunter v. Bryant*, 502 U.S. 224, 228 (1991). Rather, the issue is whether a reasonable officer could have believed that his conduct was justified. To assess the reasonableness of a particular use of force, "we balance 'the nature and quality of the intrusion on the individual's Fourth Amendment interests', against 'the countervailing government interest at stake'." *Miller v. Clerk Cnty*, 340 F.3d 959, 964 (9th Cir. 2003) (quoting *Graham v. Connor*, 490 U.S. at 396).

When evaluating a Fourth Amendment claim, "[i]t is imperative that the facts be judged against an objective standard." *Terry v. Ohio*, 392 U.S. 1, 21. "Factors relevant to assessing whether an officer's use of force was objectively reasonable include 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of officers or others, and whether he is actively resisting arrest or attempt to evade arrest by flight'." *Gonzalez v. City of Anaheim*, 747 F.3d 789, 793 (9th Cir. 2014). The "most important" factor is "whether the suspect posed an immediate threat to the safety of the officers or others". *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013).

Even the most cursory review of the facts – inclusive of the BWC footage – confirms that the Defendant Officers' actions were objectively reasonable. To wit, long before the date of the incident, plaintiff was well known to the SRPD, and the Defendant Officers, as posing a serious potential threat to law enforcement and the general-public, having been the subject of several Threat Assessments and Officer Safety Bulletins in the prior years, weeks and days preceding the underlying incident. In the days leading up to the incident, his worrisome and problematic behavior had escalated – all four of his restraining order violations giving rise to the stop and holds for his arrest were committed within roughly the one week prior to the March 23, 2022, incident – and plaintiff had thus been among the subjects of the Defendant Officers' start of shift briefings in the days immediately preceding the incident. The Defendant Officers were also aware of his previous threats to commit "suicide by cop". Significantly, in the moments before the use of force incident occurred, Plaintiff, who Officer Sousa testified was very tense and appeared to be under

-4-

Defendants' Trial Brief                                    **Case No. 3:23-cv-02478-JSC**

the influence of a stimulant, had feigned cooperation and "surrender", before recklessly fleeing the scene on foot.

### A. THE USE OF LOW-LEVEL FORCE INHERENT IN A "TWIST LOCK" CONTROL HOLD IS REASONABLE TO CONFRONT THE ACTIVE RESISTANCE OF A SUSPECT.

Officer O'Neill utilized a "twist lock" control hold to control Plaintiff and to secure him for handcuffing. This is an appropriate in-policy trained control technique used by officers to secure and control a subject until they can safely complete a search for offensive weapons prior to handcuffing. This is also a technique Officer O'Neill has repeatedly used throughout his law enforcement career without incident. The Ninth Circuit has held that a "twist lock" is a low-level of force, and one of the least intrusive control holds available. *Bernal v. Sacramento County Sheriff's Office*, 73 F.4th 678, 691, citing *Fitzgerald v. Santoro*, 707 F.3d 725, 734 (7th Cir. 2015). The Ninth Circuit and its sister courts have further held "this type of minimal force reasonable to prevent continued resistance or flight or to contain an uncooperative subject." *Bernal*, supra, at 693, citing *Ames v. King City*, 846 F.3d 340 (9th Cir. 2017; *Fitzgerald,* supra, 707 F.3d at 734.

Notably, a person's resistance to officers' efforts to bring him under control is a factor justifying force. Resistance includes behavior which may not necessarily have been violent or aggressive. Examples include stiffening an arm, attempting to pull away from the officers, holding onto an object, fleeing, or other actions to defeat the officers' attempts to escape. *Brooks v. City of Seattle*, 599 3d 1018, 1022 (9th Cir. 2010); *Arpin v. Santa Clara Valley Transportation Agency*, 261 F.3d 912, 922 (9th Cir. 2001).

### B. THE OFFICERS ARE NOT REQUIRED TO USE THE LEAST AMOUNT OF FORCE AVAILABLE.

The courts have held that there is no requirement that officers use the least amount of force available in a given situation - only that the use of the force be objectively reasonable under the circumstances known to the officer at the time of the incident. *Scott v. Henrich*, 39 F.3d 912 (9th Cir. 1994). *Wilkinson v. Torres*, 610 F.3d 546 (9th Cir 2010); *MacEhern v. City of Manhattan Beach*, 623 F.Supp.2d 1092, 1103 (C.D. Cal 2009). To hold officers to such a

-5-

standard is clearly inappropriate.

Such judgments would require reviewing the situation from the perspective of 20/20 hindsight and is contrary to this circuit's prior holding on the appropriate standard to review an officer's conduct and specific authority that an officer has no constitutional duty to use less intrusive alternatives where deadly force can be justifiably used. As stated in *Scott v. Henrich*, 39 F.3d 912 (9th Circuit 1994):

> "Plaintiff argues that the officers should have used alternative measures before approaching and knocking on the door where Scott was located. But the text of the Fourth Amendment indicates, the appropriate inquiry is whether the officers acted reasonably, not whether they had less intrusive alternatives available to them [citations omitted] Requiring officers to find and choose the least intrusive alternative would require them to exercise superhuman judgment. In the heat of battle with lives potentially in the balance, an officer would not be able to rely on training and common sense to decide what would best accomplish his mission. Instead, he would need to ascertain the least intrusive alternative (an inherently subjective determination) and choose that option and that option only. Imposing such a requirement would inevitably induce tentativeness by officers and thus deter police from protecting the public and themselves. It would also entangle the courts in endless second-guessing of police decisions made under stress and subject to the exigencies of the moment." (*Id.*, at p. 915, emphasis added)

Again, the correct inquiry is not "whether another reasonable or more reasonable interpretation of the events can be constructed......after the fact." (*Hunter v. Bryant*, 502 U.S. 224, 228 (1991). "The court must allow for the fact that officers are forced to make split second decisions in tense situations. An officer cannot be expected to accurately anticipate all the possible responses a subject may have to his commands and then tailor his actions accordingly in order for his conduct to fall into the category of reasonableness." *Reynolds v. County of San Diego*, 84 F.3d 1162, 1169 (9th Cir 1996).

### C. DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY

Qualified Immunity shields government officials performing discretionary functions from liability for civil damages "insofar as their conduct does not violate clearly established statutory or Constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). It is an immunity from suit rather than a mere defense to liability. *Hunter v. Bryant*, 502 U.S. 224 (1991).

As the U.S. Supreme court reiterated in *Pearson v. Callahan*, 555 U.S. 223 (2009):

-6-

"The protection of qualified immunity applies regardless of whether the government officials' error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact'" [citations omitted] (*Id.*, at p. 231).

As stated by the court in *Saucier v. Katz*, 533 U.S. 194 (2001), at page 205:

"The concern of qualified immunity is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct. It is sometimes difficult for an officer to determine how relevant legal doctrine . . . will apply to the factual situation the officer confronts."

In the context of excessive force, the mere general proposition that use of excessive force violates the Fourth Amendment is not enough to establish whether the right is clearly established. The right must be established with sufficient specificity that a reasonable officer would understand that what he is doing violates that right. (*Saucier v. Katz*, 533 U.S. 194 (2001).) The issue of whether a right is clearly established is a question of law to be determined by the court. *Elder v. Holloway*, 510 U.S. 510 (1994), "Qualified immunity protects all but the plainly incompetent or those who knowingly violate the law. If Officers of reasonable competence could disagree on the issue whether a chosen course of action is constitutional, immunity should be recognized." *Meredith v. Erath*, 182 F.Supp.2d 964 (C.D. Cal. 2001).

**1. Defendants Are Entitled to Qualified Immunity on Plaintiff's Claim of Excessive Force As Pertains to His Broken Arm.**

Although Officer O'Neill's actions were objectively reasonable, he is further protected by numerous immunities. Critically, qualified immunity shields government officials from liability insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Here, there was and is no such "clearly established precedent" from which Officer O'Neill, or any reasonable officer presented with the scenario he was facing, would have served as notice that in the light of pre-existing law, the unlawfulness of his conduct was apparent in the application of a "twist lock" control hold to secure Plaintiff who had only moments before ceased his flight on foot for handcuffing.

-7-

This is particularly true where (1) the Defendant Officers had probable cause, and indeed were legally required to arrest Plaintiff pursuant to Penal Code § 836; (2) where Plaintiff was a known and well-documented potential threat to law enforcement and whose aggressive and troublesome behavior had been escalating in the days leading up to the incident and who had previously threatened "suicide by cop"; (3) where Plaintiff actively and passively resisted Officer Sousa's initial attempts to place him under lawful arrest peacefully and without incident; (4) then, after feigning submission to handcuffing, Plaintiff fled on foot from Officer Sousa, who was alone with Plaintiff and vastly outsized by him, prior to a search of Plaintiff's person - he was wearing baggy clothes – for weapons or contraband; and (5) where Plaintiff was resisting by tensing and stiffening his arms as the Defendant Officers were attempting to secure him in handcuffs.

**2.  Defendants Are Entitled to Qualified Immunity on Plaintiff's Claim of Excessive Force As Pertains to His Prolonged Handcuffing.**

Plaintiff alleges that Officers Sousa and O'Neill used unreasonable force by placing him in handcuffs behind his back and/or over a prolonged period after his lawful arrest knowing that his elbow was fractured and that he was in pain. Although the Officers' actions by maintaining plaintiff in handcuffs following his complaint of injury were objectively reasonable, they are further protected by the qualified immunity doctrine. In opposing qualified immunity, plaintiff referenced numerous cases which purportedly put the Officers on notice that their conduct was unlawful. These Ninth Circuit cases dealt with subjects who were handcuffed without substantial justification or probable cause to arrest and with repeated complaints of pain from excessively tight handcuffs. This is a far cry from the facts in this case.

Here, *after* being secured in handcuffs following his lawful arrest, plaintiff complained of pain in his elbow. Though the fracture had yet to be confirmed by medical personnel, plaintiff was nevertheless made comfortable, was evaluated by EMS at the scene, and was then transported to the hospital where he was diagnosed with a right radial head fracture. The Officers made sure the handcuffs were not too tight, and plaintiff never

Defendants' Trial Brief

**Case No. 3:23-cv-02478-JSC**

complained that they were. He has not alleged, nor is there any evidence, that the allegation of prolonged handcuffing behind his back caused an additional injury or exacerbated the pre-existing injury to his elbow, that the handcuffs were too tight, that he suffered unreasonable pain as a result, or that the Officers behaved in a rough or abusive manner towards plaintiff after being secured into handcuffs. Instead, plaintiff is depicted on BWC footage sitting comfortably engaging in conversational discourse with the Officers, Jay Johnson (plaintiff's brother), and other first responders on scene. Unlike the witness in one of the cases cited by plaintiff where a witness was upset at the treatment the subject received by the officer(s), plaintiff's own brother was a witness to the entire incident, pre-and-post handcuffing, and will testify at trial that the Officers' use of force was reasonable and that they treated plaintiff with respect.

There simply is no evidence that the Officers' conduct in maintaining plaintiff in handcuffs behind his back following his complaint of pain was prohibited by clearly established law. Specifically, there is no obvious connection between a case where a subject, without substantial justification or probably cause to arrest, who was then injured by excessively tight or improperly positioned handcuffs, and the one at bar such that Officers Sousa and O'Neill would know that their conduct violated the constitutional right at issue. In fact, plaintiff does not even allege an injury or exacerbation of the pre-existing injury from his maintenance in handcuffs following his lawful arrest - he suffered no harm.

Thus, Officers Sousa and O'Neill are entitled to qualified immunity on plaintiff's claim of excessive force in relation to the allegation of prolonged handcuffing.

Respectfully Submitted,

OFFICE OF THE CITY ATTORNEY

Dated:  November 13, 2025         /s/ Nathan L. Putney

                                  _____
                                  ADAM S. ABEL
                                  Assistant City Attorney
                                  NATHAN L. PUTNEY
                                  Assistant City Attorney
                                  Attorney for Defendants City of Santa Rosa,
                                  Officer Cody Sousa, and Officer Christopher
                                  O'Neill

Defendants' Trial Brief                                    Case No. 3:23-cv-02478-JSC